284 F.2d 815
 In the Matter of WOODMAR REALTY COMPANY, an Indiana corporation, a bankrupt.
WOODMAR REALTY COMPANY, an Indiana corporation, Bankrupt-Appellant,
v.
Walter A. McLEAN, Trustee-Appellee.
 No. 13023.
 United States Court of Appeals Seventh Circuit.
 November 23, 1960.
 Rehearing Denied En Banc December 19, 1960.
 
 Owen W. Crumpacker, Hammond, Ind., Benjamin Wham, Chicago, Ill., George V. Burbach, Theodore M. Gemberling, Hammond, Ind., for appellant.
 Herschel B. Davis, Gary, Ind., for appellee.
 Before DUFFY, SCHNACKENBERG and MAJOR, Circuit Judges.
 SCHNACKENBERG, Circuit Judge.
 
 
 1
 On January 13, 1941, reorganization proceedings were started in the district court, under chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq., against Woodmar Realty Company, an Indiana corporation. Pursuant to an amended plan of reorganization, all of the real estate owned by Woodmar was disposed of by sale and there remained the matter of proper distribution of the funds, inter alia. On February 16, 1953, with the approval of Woodmar, it was adjudged a bankrupt and it was provided by the court that subsequent proceedings be in accord with the Bankruptcy Act. 11 U.S. C.A. § 636.
 
 
 2
 Woodmar was engaged in buying, subdividing and selling real estate. It subdivided a tract in Hammond, Indiana, and made extensive improvements thereon by means of city of Hammond special assessment proceedings in which bonds were sold to the public, which bonds constituted liens on the property improved.[1]
 
 
 3
 The reorganization petition against Woodmar had been filed by three owners of such bonds.
 
 
 4
 Over 300 lien claims were filed in the district court by holders of improvement bonds and coupons, and are known as "Class 2" claims.[2] No objections thereto were filed by the then trustee, Charles L. Surprise, or his successor, Walter A. McLean, appellee herein, although the court's order of November 22, 1941, authorized such action. Prior to January 30, 1951, trustee Surprise, under court orders, had sold all of Woodmar's real estate, free of the improvement bond and coupon liens.
 
 
 5
 In September 1955, trustee McLean filed a petition recommending the allowance of 310 claims based on said bonds, together with a "Trustee's Final Report". The bankrupt filed objections to 274 of these lien claims, and the district court's ruling that the bankrupt had no right to object was reversed by us in the case of "In the Matter of The Woodmar Realty Company," 7 Cir., 241 F.2d 768, 64 A. L.R.2d 883.
 
 
 6
 Upon our remandment the questions then awaiting resolution by Judge W. Lynn Parkinson[3] were the validity of the bankrupt's objections to Class 2 claims and the approval of the Trustee's Final Report. At a pretrial conference on June 28, 1957 on all claims and objections thereto, Judge Parkinson decided that, in order to establish the law of the case as to Woodmar's objections to Class 2 claims, he would select claim No. 441 and he thereupon scheduled it for trial on July 15, 1957. The court invited all Class 2 claimants, to whose claims objections had been filed by Woodmar, to be present at the trial, but the trustee and his counsel were informed by the court that they were not to participate. The trial was held on claim No. 441 on July 15, 1957 and the following day, and briefs were ordered filed.
 
 
 7
 Judge Parkinson requested Woodmar to undertake the responsibility of negotiating with the Class 2 claimants for a compromise of their claims. On July 22, 1957, the bankrupt formally filed a petition for such authority and Judge Parkinson entered an order accordingly, which provided that any compromise agreement was to be subject to the approval of the court.[4] It is undisputed that it was the desire and judgment of Judge Parkinson that the trustee and his counsel were to remain passive with respect to the efforts of Woodmar and its counsel to negotiate settlements.
 
 
 8
 Woodmar, acting through its counsel, Mr. Crumpacker, thereupon proceeded in an attempt to effect a compromise of these claims. Before we discuss the means used, it becomes necessary to consider Woodmar's relation to the Class 2 claimants. Appellee contends that the authorization of Judge Parkinson to Woodmar and its counsel to negotiate compromise settlements with the lien holders had the effect of making Woodmar and its counsel fiduciaries in those negotiations. On the other hand, Woodmar argues that in these negotiations it occupied no fiduciary relationship and that the parties dealt as adversaries and at arms' length.
 
 
 9
 These conflicting contentions require that we note the situation existing in the bankruptcy estate at the time the negotiations took place. It is evident that the court had confidence in Mr. Crumpacker, but that has no bearing upon the question raised by the contention of appellee that Woodmar in the succeeding negotiations was acting in a fiduciary relationship with the lien holders. As a result of the court proceedings from their inception, the entire property of Woodmar had passed into the possession of a trustee of the court, who had in turn been succeeded by another trustee. These assets, which consisted of real estate, had been by court sale converted into cash and the rights of the lien holders had been thereby transferred to the proceeds of sale. It is the law of bankruptcy that, upon the satisfaction of all prior claims and charges, any amount remaining in this fund would belong to Woodmar. After some small general claims,[5] as well as some preferred claims, such as taxes, attorneys' fees and other costs of administration of the bankrupt estate, there remained to be satisfied only the Class 2 claimants. The balance of this depleted fund would become the property of Woodmar. The more that was allowed the lien claimants, the less Woodmar would recover from its property. The less that the claimants would receive, the more Woodmar would recover. As we said, In re Woodmar Realty Company, 7 Cir., 241 F.2d 768, 771:
 
 
 10
 "The bankrupt has been permitted to object to allowance of claims in cases where in the event of disallowance there would be a surplus left for the bankrupt. * * * The bankrupt's interest in having claims in excess of $300,000 disallowed, in which event a substantial surplus would be available for the bankrupt, is obviously real, and the conclusion is inescapable that under these circumstances the bankrupt is a `party in interest.' * * *"
 
 
 11
 Although the first trustee appointed had been authorized by the district court to file objections to the claims filed by the lien holders, both he and appellee, his successor, failed to do so and thereupon Woodmar itself filed such objections, after we held that it was entitled to do so. In re Woodmar Realty Company, supra.
 
 
 12
 The pending litigation was in reality between Woodmar and the lien holders. Whether it was litigated to a finish or settled, they were the ones who would ultimately be affected thereby. Such litigation was really an ordinary civil controversy. The parties, whether in litigating in the courtroom or in settling outside the courtroom, were engaged in an adversary activity and dealing at arms' length. The fact that Judge Parkinson warned the trustee to keep his hands off the negotiations is evidence that he believed that thereby the negotiations might be more smoothly conducted to a conclusion rather than that thereby he was changing the character of either Woodmar or its attorney into a fiduciary. We hold that no fiduciary relationship existed between the parties to the negotiations. In view of that holding, less importance attaches to the means used by Crumpacker in settling those claims. However, we prefer to discuss them. He sent letters[6] to Class 2 claimants in an effort to settle these claims. We have read them and find that they are not properly subject to the severe criticism leveled against them by appellee or the district court.
 
 
 13
 Woodmar's brief in this court asserts, and appellee's brief does not deny, these facts:
 
 
 14
 Of the 102 Class 2 lien claimants who entered into stipulations of dismissal with Woodmar, 75 were represented by counsel. Of the 27 not so represented, several were themselves attorneys-at-law. A few others were business firms, corporate or otherwise. Eight of the stipulations carried the approval of courts having custody of probate estates.
 
 
 15
 The first letter, which was approved by Judge Parkinson, was sent out in Woodmar's name by Mr. Crumpacker, its counsel.
 
 
 16
 The second letter was sent on the letterhead of Crumpacker's law firm. It referred to the protracted bankruptcy proceedings of Woodmar and stated that the assessment bonds were not Woodmar obligations, but represented lien rights against Woodmar real estate as well as other real estate. The letter stated that according to records the attorneys in statutory foreclosure suits on said bonds had collected money in these actions which should have been applied to the retirement of bonds, and, "Many additional reasons exist why the Woodmar Realty Company cannot approve the allowance of claims based on special improvements."
 
 
 17
 The letter referred to 11 interrogatories enclosed, which asked for information to expedite early disposition of the claims. The letter offered to give detailed information if the addressee desired it and suggested that, if the addressee had no attorney, he retain one. Appellee herein attacks this interrogatory:
 
 
 18
 "Has claimant written off the bonds as a loss on any federal income tax return for the purpose of obtaining an income tax deduction?"
 
 
 19
 It seems to us that when Woodmar was attempting to compromise with a bondholder, it was reasonable that it learn whether the bondholder, after holding the bond for years without income, had written it off as a loss on his federal income tax return. If he had, this might affect his judgment as to the amount of settlement he would insist upon.
 
 
 20
 The third letter was from the same law firm and contained a rather full report of the bankruptcy proceedings. While undoubtedly colored by Woodmar's characterization of the conduct of trustee Surprise, his attorney and his accountant, the letter did refer to facts which, in view of the district court's ruling herein, are pertinent. For instance, the following appeared:
 
 
 21
 "If any lien rights exist in favor of claimants, at least similar lien rights exist against the proceeds of the so-called `John Doe Trust'. (Cause No. 51815, Lake Superior Court Room No. 5, Hammond.)"
 
 
 22
 In view of the fact that Woodmar was attempting by these letters to settle with lien claimants, whose interests were hostile to its own, and that an effort to compromise between adversary interests was involved, we feel that Woodmar's counsel, without abandoning his responsibility to his client, dealt fairly with the bondholders. What their rights, if any, may have been in the so-called "John Doe Trust" under Indiana state law, arising from real estate not involved in this proceeding, they were voluntarily alerted by the express language above quoted from the third letter.
 
 
 23
 It is our conclusion that the holders of these liens were not deceived or imposed upon by any of the negotiating efforts of Woodmar. That conclusion is corroborated by the fact that neither before nor after the settlements were made has any one of those claimants appeared in court and made any protest or objection to the methods used in procuring their agreement to compromise their liens. In fact, attorney Leo Rieder, who represented bondholders D. D. Bowsher, Ferrie H. Fulton, Lawrence J. Harwood, Joseph W. Lauber and Emma Lauber, appeared before Judge Robert E. Tehan in the district court and testified that he saw the letters and interrogatories from Woodmar and investigated the foreclosure aspects of certain of the rolls that affected the Woodmar real estate, whereupon he entered into the settlement agreements proposed. After the deaths of various owners, he had inventoried such Indiana bonds at a value of "five cents on the dollar".
 
 
 24
 A hearing before Judge Tehan began on May 20, 1958, on Woodmar's petition for approval of 84 settlement agreements, and a similar petition filed June 27, 1958 covering 18 additional agreements. Although notice of the proposed settlements had been sent to all parties in interest, no objections were made and no one appeared in opposition to the petitions. The court heard evidence and took the matter under advisement on July 30, 1958. On January 19, 1960, Judge Tehan entered an order denying approval of these 102 settlement agreements with lien claimants and 3 compromise agreements with creditors. From that order this appeal has been taken by Woodmar.
 
 
 25
 Appellee now admits that there is no material dispute over the facts and that
 
 
 26
 "* * * the only thing which the trial court was called upon to decide was the propriety of the action of the bankrupt and its counsel affecting the proposed compromises."
 
 
 27
 In his post-order opinion of February 11, 1960, Judge Tehan "ordered" that the court's orders of July 22, 1957 and August 30, 1957 be vacated and set aside,[7] stating that this was by reason of certain conclusions which had been reached, including the following:
 
 
 28
 "* * * in that Woodmar, with the duty of fair treatment gave preferential treatment to some and penalized others in the variances extending from 18% to 200% * * *".
 
 
 29
 The record shows that Woodmar's attorney had already informed the court that he was attempting to use about one-third of a claim as a basis for negotiation for compromise. Therefore, this statement of fact by the court is alarming and, if correct, tends to explain the court's theory. Along the same line, the trustee, in his brief in this court, relies heavily upon this charge of alleged "preferential treatment", saying:
 
 
 30
 "* * * An examination of these petitions, particularly Petition No. 3 and Petition No. 4 will show the wide variance in the percentage of these settlements as compared to the amount found due by the Trustee. In the aggregate, the compromises are sought by the appellant for about 34.4% of the amount found due by the Trustee — yet, there is a wide spread in the amounts actually to be paid to the various claimants. For example, Claim No. 4, of one Minnie Hood, of Columbia City, Indiana, whose claim was recommended for allowance by the Trustee in the sum of $548.60, was offered $100.00, or about 17%. The heirs of Andrew Kenner are offered $350.00 on a claim on which the Trustee had recommended $2543.12, or a settlement of approximately 13.7%, and Walter McConnell is offered $135.00 on a claim on which the Trustee had recommended $981.70, or about 13.7%. Cressa Stellar, on the other hand, is offered $350.00 on a claim on which the Trustee had offered $218.30.
 
 
 31
 "* * * The court in its decision denying approval to the compromises found as a fact that the amount offered to the claimants varied from 18% to 200%, as compared to the amount recommended by the Trustee."
 
 
 32
 It is not surprising, therefore, that the district court, faced with these representations, remarked that "it would appear that there is no uniformity in the type of settlement offered. * * *" Unfortunately the figures, evidently furnished to him by the trustee, were grossly inaccurate and could not have failed to mislead the court. This will appear from the following tabulation:
 
 
 33
 Claim Col. 1 Col. 2 Col. 3 Col. 4 Col. 5
 ----------------------------------------------------------------------------
 Incorrect
 Amount statement
 found due in trustee's
 to lien brief as to
 claimant in amounts of
 Trustee's Woodmar's Percent Correct Percent
 Final compromise statement
 Report of of Col. of items of Col.
 Sept. 7, settlements 2 to set forth 4 to
 No. Name 1955 Col. 1 in Col. 2 Col. 1
 ----------------------------------------------------------------------------
 4 Minnie Hood $ 548.64 $100.00 18.2% $190.00 34.6%

 460 Heirs of
 Andrew Kenner 2543.12 350.00 13.7 850.00 33.4

 467 Walter L.
 McConnell 981.70 135.00 13.7 350.00 35.6

 470 Cressa Stellar 218.30 350.00 160.3 85.00 38.9
 
 
 34
 The italicized figures are erroneous, and they confused the district court.[8] It will be noted that the correct report of percentages of the settlements was very close to 1/3 of the amounts which the trustee's final report found due to the lien claimants on these four claims. They are consistent in amount with the uniform plan of Woodmar to attempt to secure settlements with all lien claimants on a basis of approximately 1/3 of the amount due on their bonds.
 
 
 35
 In compromising with bondholders, the bankrupt took an assignment of their bonds and coupons. In the district court, when the court called attention to the fact that thereby the bankrupt might become entitled to realize some recovery out of the John Doe trust, as the holder of such bonds and coupons, the bankrupt's counsel reassigned them to the trustee and stated that no irregularity was intended, since he felt confident Woodmar would prevail and be entitled to the bonds and coupons and other assets. In this court, the trustee has made no point with respect to the assignment of these bonds and coupons to the bankrupt and we, therefore, do not pass upon the propriety or effect thereof.
 
 
 36
 The facts in this case are not in dispute. The evidence is largely documentary. The district judge erred in denying approval of the settlement and compromise agreements referred to in his order filed on January 19, 1960 and, for the reasons herein expressed, it is necessary that we reverse that order and remand this cause to the district court with instructions to enter an order approving said settlements and compromise agreements referred to in said order.
 
 
 37
 This litigation is being prolonged by a trustee in bankruptcy who is the second in a succession of trustees who have been administering this trust since the early part of 1941. It is hoped that the energy which the trustee evidences in this appeal may soon result in the winding up of one of the oldest bankruptcy estates in the Seventh Circuit.
 
 
 38
 Order of January 19, 1960 reversed and cause remanded with instructions.
 
 
 
 Notes:
 
 
 [1]
 This reference to the bonds as "liens" is sufficient for the purpose of this opinion, although Woodmar, in its brief, attempts to resort to a restrictive definition in applying the word to improvement bonds
 
 
 [2]
 The court had made a claims classification placing tax claims in Class 1, claims on said bonds in Class 2, claims on first mortgage real estate bonds in Class 3, claims of judgment creditors in Class 4, claims of all unsecured general creditors in Class 5, and claims of common stockholders of Woodmar in Class 6
 
 
 [3]
 After Judge Luther Swygert had conducted extensive hearings on the final report, he disqualified himself and Judge Parkinson succeeded him in the hearing of the case
 
 
 [4]
 A motion attacking the order of July 22, 1957 was filed on August 21, 1957 by attorneys Floyd R. Murray and Edmond J. Leeney, charging that the bankrupt had undertaken to usurp the duties and the powers of the trustee herein, by writing letters to the lien claimants "offering to enter into a compromise with said lien claimants * * *"
 An answer was filed by bankrupt, a hearing was held on August 30, 1957, and the motion was denied. At the same time the court modified its order of July 22, 1957 slightly. No appeal was taken from either order.
 
 
 [5]
 Amounting to about $1400
 
 
 [6]
 Attorney Crumpacker used as a basis for negotiating with lien holders an offer of about one-third of the amount due upon their claims as set forth in the final report of the trustee of September 7, 1955, ante, 2
 
 
 [7]
 However the record does not show that any order was entered by the court to this effect
 
 
 [8]
 Although immaterial, it is but fair to state that the alleged errors reported by the trustee to the district judge were the results of separate mistakes by both the trustee and Woodmar in their respective reports and petitions. We are not here concerned with placing the blame for the mistakes. We are concerned only with their effect on the decision of the district court
 
 
 
 39
 MAJOR, Circuit Judge (concurring).
 
 
 40
 I agree to and concur in the result reached by Judge Schnackenberg. In doing so, I must admit I am motivated to some extent by the practical aspects of the situation. This proceeding has been in court for almost twenty years, and a great deal of ill feeling has been engendered. An affirmance of the order appealed from would mean that each claim would be for trial and decision on its own merits. This in all probability would require many more years of litigation. More than that, in my view, the lien claimants under the terms of the compromise are in all likelihood better off than if the compromise is vacated and set aside. They evidently so thought, because, although given notice and opportunity to do so, not a single one appeared and entered objections to the compromise, and no lien claimant is objecting here. They were all notified to obtain counsel if they so desired and most of them had counsel during the negotiations which led to the compromise with Woodmar. The record does not reveal, in my view, that the lien claimants were ignorant of their rights or that they acted other than in a manner which they considered best for them under the circumstances. Such being the case, this court as well as the district court should attempt to terminate this prolonged and vexatious litigation.
 
 
 41
 DUFFY, Circuit Judge (dissenting).
 
 
 42
 The majority opinion states that Woodmar and the lienholders, in reaching settlement agreements, were dealing at arm's length. I disagree.
 
 
 43
 Woodmar was authorized by the Court to conduct negotiations for the settlement of claims of lienholders. This function would, ordinarily, be carried on by the trustee. The sums in settlement of such claims were to be paid from a fund in the custody of the Court. The majority opinion holds that in conducting such negotiations, Woodmar and its attorney were not acting in a fiduciary relationship. Again I disagree.
 
 
 44
 The real basis for the majority opinion would seem to be the astounding statement, "* * * we feel that Woodmar's counsel, without abandoning his responsibility to his client, dealt fairly with the bondholders." This is contrary to the findings of the experienced trial judge who decided this case. The trial court found the bankrupt's attorney's conduct to be "reprehensible." The Judge stated he was appalled at the disclosure of how the authority given to Woodmar's attorney was abused. There is an abundance of evidence in this record to sustain the finding of the Court.
 
 
 45
 The opinion ends with a criticism of the trustee. It incorrectly accuses him of prolonging this litigation. This is followed by some gratuitous advice as to the trustee's further actions. I believe these criticisms and comments are unjust and wholly unwarranted, and should not appear in any opinion of this Court.
 
 
 46
 Perhaps it might be advisable if we first consider some legal fundamentals. This is a proceeding in bankruptcy. True, it started as a reorganization proceeding under Chapter X of the Bankruptcy Act. However, on February 16, 1953, after Judge Swygert had found the amended plan of reorganization had not been consummated and that the proposed amendments to the plan were not feasible, an order was entered adjudicating Woodmar Realty Company a bankrupt and provided that bankruptcy be proceeded with in accord with Section 236(2) of the Bankruptcy Act. 11 U.S. C.A. § 636(2).
 
 
 47
 One of the principal concerns of a Bankruptcy Court should be that the rights of creditors be protected. Many times their claims are small, and the amount involved does not warrant the hiring of an attorney. One reason for my dissent is that under the holding of the majority opinion, the many lienholders in this case have not been protected. On the contrary, the attorney for the bankrupt, by methods and conduct characterized by the trial judge as "reprehensible" has obtained stipulations for compromise settlements whereby most of the lienholders will obtain one third or less of the amount they would be entitled to receive under the terms of the bond.
 
 
 48
 At the time the petition for reorganization herein was filed, Woodmar had been a dormant inactive corporation for more than ten years. Its sole assets were 1540½ vacant lots and 12 undivided blocks in Hammond, Indiana. Holders of improvement bonds in forty-nine separate rolls[1] affecting Woodmar property were pursuing their state-court remedy of foreclosure.
 
 
 49
 It appeared that Woodmar was about to lose most, if not all, of its interest in the vacant property. The continued prosecution of these foreclosure actions was then enjoined by the District Court insofar as they affected Woodmar's property. All other legal proceedings against Woodmar's property were likewise enjoined.
 
 
 50
 The right which each lienholder had to foreclose his lien was taken from him by action of the Bankruptcy Court. The trustee took possession of all of Woodmar's property. Thereafter the property was sold and the lien claimants' rights were transferred to the funds which had been received upon the sale of the property.
 
 
 51
 The Class 2 claims are the claims of some three hundred holders of special improvement bonds issued pursuant to resolutions of the Board of Public Works of the City of Hammond, Indiana. These were adopted under statutory authority known as the Barrett law.
 
 
 52
 In September, 1955, the trustee, whom the majority says is delaying this litigation, filed his final account. The trustee reported on the result of an audit study of the books and records of the City of Hammond which represented, in his judgment, special assessment lien indebtedness on the bankrupt's property at the time such property was sold in these proceedings. This study had been made pursuant to Court authorization and at an expense of $15,000. The trustee recommended an allocation of cash to 313 claims and the payment of some 270 claims where the bonds and coupons had been produced and checked by him, his counsel and his staff. The bankrupt filed objections to the allowance of the claims.
 
 
 53
 On June 28, 1957, Judge Parkinson decided to try a typical Class 2 claim, and Claim 441 was selected. For some reason the Court instructed the trustee and his counsel not to participate in the hearing. It is possible the Judge read something into our opinion in In the Matter of Woodmar Realty Company, 241 F.2d 768, which was not there. In that case, we restated the general rule that a bankrupt is not a party of interest, but we held that case came within the exception permitting a bankrupt to object to the allowance of claims where a disallowance would result in a surplus for the bankrupt. However, there was no suggestion in that opinion that the bankrupt should supplant the trustee in the exercise of his proper or lawful functions.
 
 
 54
 On July 22, 1957, at a time when Claim 441 was under advisement by the Court, Woodmar obtained an ex parte order authorizing it to negotiate with Class 2 claimants for settlement of their claims which would be paid out of funds in the trustee's possession. The order provided any compromise would be subject to the approval of the Court. Woodmar's attorney submitted a letter which he proposed sending out. After making some changes therein, Judge Parkinson gave his approval. The last paragraph of the letter was, "This letter has been submitted to the District Court and approved thereby as to both form and content."
 
 
 55
 At two-week intervals thereafter, Woodmar's attorney sent out second and third letters to the lienholders. These letters were not submitted to the Court. Like the first letter, they were written on the legal stationery of counsel for Woodmar. The letters were belligerent in tone. They emphasized that the lien bonds were not the obligation of Woodmar. Advice was given to hire an attorney "since the claims will ultimately have to be tried." Eleven interrogatories were appended to the second letter. Questions 7 and 8 asked questions as to how the claimant treated the bonds on his income tax return. The trial court found the second and third letters "presented a distorted, incomplete and partisan view of the proceedings."
 
 
 56
 But, more significant was what the letters did not contain. They did not inform claimants that the letters were sent without Court inspection or approval. They did not inform claimants that a case was under advisement by the Court which would determine the validity of various objections offered by Woodmar. The letters failed to explain that in the State Court, under the so-called John Doe Trust, there was a fund of approximately $110,000 in which many of the lienholders of Woodmar's property would be entitled to share.
 
 
 57
 The majority opinion states: "It is evident that the court [Judge Parkinson] had confidence in Mr. Crumpacker, * *." Maybe so. However, on the hearing held August 30, 1957, the Judge sharply rebuked Mr. Crumpacker for sending the second and third letters, saying: "The letter[s] should not have been written, Mr. Crumpacker, because the court authorized and approved that letter was to be written and that was the only letter to be written, and that letter should only have gone to counsel for the lien claimants or if not represented by counsel, then to the lien claimants themselves." (Emphasis supplied)
 
 
 58
 The effect of these letters is obvious. The recipients could reasonably infer that as the first letter was approved by the Court as to contents, the same was true of the two letters which followed shortly thereafter. Claimants resided in many localities, some a long distance from Hammond. Many had claims of relatively small amounts. Of the 83 claims listed in the Court's order of July 16, 1958, 49 of them were for less than $500.00 and 21 were for less than $300.00. Woodmar had threatened claimants with long and costly litigation on a case to case basis. The trial court observed "* * * Woodmar arrogantly gave the calculated impression that there was no chance for the claimants to prevail in any trial; * * *" The hiring of an attorney was obviously impractical for many of the lienholders. The interrogatories in the area of income taxes were, as the District Court stated, "calculated to frighten and discourage claimants from asserting their rights * *."
 
 
 59
 To avoid all the trouble and grief depicted by Woodmar's attorney who gave the impression he spoke with the cloak of the Court wrapped around him, the claimants were willing to settle for just about anything that was offered. I think it of no significance that on the hearing below, lienholders had not filed formal objections repudiating the deals that they had made. I am also of the view that this case should not be decided on the basis of expediency.
 
 
 60
 Who, then, was protecting the rights of these claimants? Not the trustee, for he had been pushed aside. Surely it was not Mr. Crumpacker. I quote with approval from the opinion of the trial court: "In this case, however, we have a situation where the powers of a trustee to negotiate settlements were removed from him and entrusted to a bankrupt who is a party in interest and was represented by agents who likewise stood to gain or lose depending upon the amount of the settlements arrived at.[2] In accepting the powers of the trustee, Woodmar and its agents must be deemed to have accepted the same responsibility for their actions as a trustee would owe to the court and the parties."
 
 
 61
 It seems to me that it was the unquestioned duty of a court of equity to act promptly in setting aside the agreements for settlement which were obtained in the manner hereinbefore described.
 
 
 62
 After Judge Parkinson became a member of this Court and had not decided the contest as to Claim 441, Chief Judge Tehan was assigned to the arduous task of taking charge of this bankruptcy matter. He faced many complicated and difficult problems. The records and files were voluminous. At different times four judges had preceded him in this matter. Judge Tehan had no previous contact with the bitter litigation that had taken place in this proceeding over the years.
 
 
 63
 Chief Judge Tehan is an able and experienced judge. He, unlike us, has become acquainted with many other facets of this proceeding. He gave four days to the hearing on the matter now before us. He was shocked at the manner in which the settlement stipulations were obtained. He decided that settlements obtained in the manner described, and to be paid out of funds in the custody of the Court were, indeed, a matter of concern to the Court. His action in setting aside those stipulations for settlement should have the enthusiastic approval of this Court. The conduct and manner in which the settlement agreements were obtained can not be glossed over by saying it involved only an arm's length transaction.
 
 
 64
 Why should the lien claimants receive less than the amounts which were allocated by the trustee based on the accountant's study? We know by taking judicial notice of our records, that Judge Tehan, in deciding the issues in Claim 441 overruled many objections made by Woodmar. The present posture is that there is no validity to most of the objections which have been filed by Woodmar. Whether Judge Tehan's decision in this respect may be sustained or reversed on appeal we, of course, cannot say, but in the meantime, there is no basis for cutting down the claims of the lien claimants by approximately 66 2/3% of the amount allocated by the trustee, simply because bankrupt's counsel obtained stipulations by the method hereinbefore described.
 
 
 65
 The majority opinion contains a table which I do not understand. These figures are, apparently, the basis for the criticism leveled at the trustee. The opinion states the figures furnished by the trustee were grossly inaccurate. Four illustrations were given. Column 2 of the table lists the supposedly incorrect amount which Woodmar offered in settlement. Referring to the Minnie Hood bond, the opinion states $100 is an incorrect figure, yet, page 31 of the appendix shows $100 is the correct figure. Referring to the Walter McConnell claim, the majority opinion says that the figure of $135 should be $350, yet the table on page 44 of the appendix which is over the signature of Woodmar's attorney, shows the correct figure is $135.
 
 
 66
 In the Cressa Stellar claim, the opinion states the figure $350 should be $85, yet again, the table on page 44 of the appendix shows that $350 is the correct figure.
 
 
 67
 There does seem to be one error out of the four cited. In the claim of the heirs of Andrew Kenner, someone transposed the figures 3 and 8, and the correct amount offered by Woodmar in compromise was $850.
 
 
 68
 I must again protest at the unjust charges leveled by the majority opinion at Mr. McLean, the trustee. He is a respected and highly competent business man. He acted as trustee for almost four years under Judge Swygert, and that Judge apparently approved the manner in which he carried out the responsibilities of his office. In spite of Woodmar's attorney filling the air with charges of fraud and demands that the trustee be removed, Judge Swygert retained him as trustee. Then Mr. Crumpacker demanded that Judge Parkinson remove the trustee, but the Judge did not do so. Mr. Crumpacker renewed his vendetta before Judge Tehan, but after more than two years' observation of the trustee, it is evident that Judge Tehan thinks highly of his services and his competency. I suggest this Court does not have sufficient information to pass judgment on the competency of the trustee who has been carrying out the duties of his office for almost eight years under a constant barrage of charges and condemnations all emanating from one attorney.
 
 
 
 Notes:
 
 
 [1]
 Woodmar's property had originally been affected by 60 improvement resolutions, some of which also affected property owned by others
 
 
 [2]
 The Court was referring to the contingent fee arrangement whereby Mr. Crumpacker expects to receive a third of any money received by Woodmar. Of course, the more the claims could be reduced, the more Woodmar would receive